UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL LAMAR ROSE,<br><br>　　　　Petitioner,<br><br>　　vs.<br><br>A. HEDGPETH, Warden,<br><br>　　　　Respondent. | ) Case No. EDCV 11-1654-MMM (JPR)<br>)<br>)<br>) ORDER ACCEPTING FINDINGS AND<br>) RECOMMENDATIONS OF U.S.<br>) MAGISTRATE JUDGE<br>)<br>)<br>)<br>) |

　　Pursuant to 28 U.S.C. § 636, the Court has reviewed de novo the Petition, records on file, and Report and Recommendation ("R&R") of the U.S. Magistrate Judge.  On May 17, 2013, after one 90-day and two 30-day extensions of time, Petitioner, through counsel, filed Objections to the R&R.  He specifically challenges the Magistrate Judge's findings regarding (1) defense counsel's alleged failure to interview exculpatory witnesses or watch a video interview of Michael Denmon, the main prosecution witness, that was allegedly posted on the internet (subclaim B of claim two in the R&R), and (2) the trial court's alleged violation of Petitioner's right to counsel during the hearing on his postverdict motion for new trial, a "critical stage" of the proceedings (subclaim B of claim three).  (See Objections at 8-

19.)

I. **Counsel was not ineffective for allegedly failing to interview exculpatory witnesses or watch Denmon's interview**

Petitioner argues that counsel was ineffective for failing to contact or "even speak to" Charlene Bell and Africa Bolden or follow up on Peggy Ramos's tip to watch Denmon's interview on the internet, which all allegedly would have revealed exculpatory information. (Objections at 8-14.) Petitioner overstates the importance of counsel's failure to actually speak to Bell and Bolden, however, because as the Magistrate Judge noted in the R&R (R&R at 34-35), the defense investigator spoke to both, as Petitioner concedes. And Petitioner's claim concerning the alleged Denmon interview is not supported by the record.

Counsel explained at the postverdict Marsden[1] hearing that he had "in [his] possession" "detailed statements" from Bell and Bolden; he then summarized those statements in depth and concluded that they "[b]asically" consisted of what Denmon had "told the jury" during his testimony at trial. (See Lodgment 2, Sealed Rep.'s Tr. at 8-9 (counsel stating that Denmon purportedly told Bell and Bolden that Petitioner "didn't do anything" and never "used any physical violence against anybody," "shot . . . [or] attempted to shoot anybody," "forced anybody to do anything," or "hit anybody").) Counsel did not mention Denmon's purported statements that he wanted to frame Petitioner because he was related to codefendant Donald Shorts, however (see Pet. at 16 (claiming that Bell and Bolden asked Denmon why he would

---

[1] People v. Marsden, 2 Cal. 3d 118, 123-24, 84 Cal. Rptr. 156, 159-60 (1970).

"allow[] [Petitioner] to possibly spend his life in prison," to which Denmon allegedly replied, because "Shorts is the petitioner's cousin"));[2] the R&R separately found that to the extent Denmon made those statements, counsel's allegedly deficient performance was not prejudicial (see R&R at 35). Responding to Petitioner's allegation that counsel failed to contact those witnesses "by phone or anything," counsel stated that he was certain that he had at least a statement from Bolden but was "not sure about" Bell; counsel nonetheless claimed that he "was told what they would say." (Lodgment 2, Sealed Rep.'s Tr. at 11-12.)

    Petitioner admits in the Petition that either he told counsel about Bell's and Bolden's statements or the defense investigator, "Mr. F. Krasco," did after interviewing them at counsel's behest. In particular, the Petition alleges:

    3.    Despite having evidence which collaborated [sic]

---

[2] Petitioner repeats the same assertion in his Objections. (See, e.g., Objections at 1 ("Denmon had confided to two people that he testified not because [Petitioner] was guilty, but because [Petitioner] was related to the man actually responsible for the crimes, whom [Petitioner] did nothing to stop.").) When Petitioner raised this claim in state court, however, his summary of what Bell and Bolden said was somewhat different: "When . . . asked why was he (Denmon) allowing [Petitioner] to take the fall for something he did not do, M. Denmon's response was that since D. Shorts is [Petitioner's] cousin, it must have been a set up; this was despite his, Denmon's, having no evidence that this 'set up' was true." (Lodgment 14 at unnumbered 17 (emphasis added).) Obviously, Denmon's conjecture that Petitioner and Shorts likely conspired to commit the crime given its circumstances and their familial relationship is different from his saying that he fingered Petitioner only because he was related to Shorts. Thus, given Petitioner's evolving claim, it is not at all clear that Bell and Bolden ever even said what Petitioner now claims they did.

3

> [Petitioner]'s version of what occurred immediately following the incident, as well as motivating factors leading to Mr. Michael Denmon providing false information to investigators, and in his testimony, [defense counsel] did not follow up on any of it.
>
> 4. The information in the above (#3) was found out by Mr. F. Krasco. [Petitioner] had informed his counsel of witnesses whom could provide credence to his statements; Mr. Krasco was assigned by the defense to investigate this. Among those whom Mr. Krasco was referred to were Ms. Africa Boulden [sic], Ms. Charlene Bell, and Mrs. Peggy Ramos.

(Pet. at 14; see, e.g., id. at 15-16 (summarizing Bell's purported statements, which "w[ere] provided to the defense by Ms. Bell," but claiming that neither counsel nor Krasco followed up by interviewing Denmon "[d]espite having this information"), 17 (faulting counsel for failing to "personally" interview witnesses and Krasco for "fail[ing] to take any significant steps to confirm information provided by those who kn[e]w both Mr. Denmon and [Petitioner]").)

Thus, contrary to Petitioner's contention that counsel's failure to "speak" to Bell or Bolden meant that he "could not have made an informed decision" about the probative value of their statements (see Objections at 9 (emphasis in original)), counsel presumably did not pursue those leads after discovering through the investigator, who did interview them, that their statements about Petitioner's somewhat passive involvement would be redundant to Denmon's testimony. Petitioner's supporting

cases are distinguishable because in them no one from the defense interviewed the potential witnesses whom the defendants asked counsel to interview.  Cf. Howard v. Clark, 608 F.3d 563, 570-71 (9th Cir. 2010) (finding counsel ineffective for refusing to interview victim even though petitioner asked him to); Riley v. Payne, 352 F.3d 1313, 1318-19 (9th Cir. 2003) (finding counsel ineffective for never speaking to eyewitness who would have testified that petitioner shot in self-defense); Harris v. Wood, 64 F.3d 1432, 1435-37 (9th Cir. 1995) (finding counsel ineffective for failing to hire investigator or interview most witnesses named in police report or any on petitioner's list). The Court therefore concurs with the Magistrate Judge that Petitioner has failed to show that defense counsel performed deficiently as to those statements from Bell and Bolden.

    The Court likewise concurs with the Magistrate Judge that counsel was not deficient for allegedly failing to follow up on Ramos's tip about Denmon's video interview.  As a preliminary matter, Petitioner incorrectly contends that the Magistrate Judge failed to address that claim in the R&R.  (See Objections at 10.) The R&R accounted for that claim, first by noting in Section II.B that Petitioner argued that counsel allegedly failed to call "three witnesses who possessed exculpatory information," including Ramos, who would have testified in part that "she found an internet videoclip of Denmon giving an interview generally stating that Petitioner 'played no true role in the crimes.'" (See R&R at 32-33.)  The R&R then addressed that specific claim at the beginning of the analysis section: "Under de novo review, the Court finds that Petitioner's counsel was not ineffective for

failing to call the witnesses" – including Ramos – because "counsel correctly surmised that such testimony would be redundant in light of Denmon's trial testimony." (See id. at 34-35.) Petitioner has not alleged that Denmon revealed in the interview any improper motive causing him to retaliate against Petitioner by testifying against him. (See Pet. at 16-17.) In any event, to the extent Petitioner makes such a claim, the R&R likewise accounted for it, concluding that counsel's "failure" to investigate or call witnesses to testify as to allegedly exculpatory statements relating to Denmon's motive to "retaliate against Shorts by framing Petitioner" was not "prejudicial." (See R&R at 35.)

Petitioner's speculation that counsel failed to "even view" Denmon's video interview (see Objections at 10-11; Pet. at 17 (claiming that neither counsel nor investigator by "their own admission" "bothered to review the video")) is not supported by the record. In fact, nothing in the record shows that counsel or the investigator admitted to that fact or were even notified by Ramos of the video's existence. At the Marsden hearing, the trial court gave Petitioner numerous opportunities to explain why counsel was ineffective, but he never mentioned Denmon's interview or his counsel's alleged failure to watch it as one of the reasons. (Cf. Lodgment 2, Sealed Rep.'s Tr. at 2-6 (Petitioner claiming that counsel was ineffective for failing to call three witnesses, including Ramos, who would have testified that she received threats from gang members seeking to deter Petitioner from testifying).) Indeed, Petitioner apparently never even alleged that Denmon's taped interview existed until he

filed his state habeas petitions, more than two years after he was convicted. (See Lodgment 14 at unnumbered 18; R&R at 4.)

In any event, assuming Ramos notified counsel of the video – which allegedly showed Denmon stating that Petitioner was "a bitch," "didn't shoot nobody," "didn't have a gun," "ain't got no heart," "ain't no killer," and "played no true role in the crimes"[3] (Pet. at 16-17) – before trial, the Magistrate Judge properly found that the alleged statements in it, if admissible, would have been redundant to Denmon's testimony that "Petitioner was present during the incident but did not join his codefendants in threatening or harming Denmon" (R&R at 35). Thus, even

---

[3] Again, when Petitioner raised this claim in state court, he was much more equivocal about Denmon's purported statements, claiming only that Denmon called him, among other things, a "bitch" and "follower" and not a "killer"; he then argued that "[b]asically Denmon was bragging about having [Petitioner] incarcerated and making light of the fact that [Petitioner] had no real involvement in the offenses" (see Lodgment 14 at unnumbered 18 (emphasis added)), which is different from Denmon directly making those assertions, as Petitioner appears to suggest in the Petition (see Pet. at 16-17 (Denmon "bragg[ed] about having [Petitioner] incarcerated despite his knowing that [P]etitioner played no true role in the crimes")). Petitioner's failure to submit an affidavit from Bell, Bolden, or Ramos or present any tangible evidence of Denmon's video interview, along with his evolving and increasingly self-serving description as to what that evidence was, also support denying this claim. See Dows v. Wood, 211 F.3d 480, 486 (9th Cir. 2000) (rejecting ineffective-assistance-of-counsel claim based on counsel's failure to interview or call alibi witness because petitioner provided "no evidence," such as "an affidavit from . . . th[e] alleged witness," that he "would have provided helpful testimony for the defense"); see also Turner v. Calderon, 281 F.3d 851, 881 (9th Cir. 2002) ("self-serving statement" insufficient to raise claim for relief); Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (finding that mere speculation that witness might have given helpful information if interviewed insufficient to establish ineffective assistance of counsel).

assuming the R&R failed to specifically address Petitioner's argument about Denmon's interview, the R&R's analysis correctly found that Denmon's purported statements would have been redundant to his trial testimony, as explained above. Cf. Deere v. Small, No. EDCV 08-1009-R(CW), 2012 WL 3039184, at *1 (C.D. Cal. July 23, 2012) (accepting R&R because even assuming it failed to address petitioner's jury-misconduct claim, as alleged in objections, that claim lacked merit).

Petitioner argues that the Magistrate Judge incorrectly found that counsel was not ineffective in concluding that all three witnesses' hearsay statements were "redundant" to Denmon's testimony because counsel in fact could have impeached Denmon with them, particularly those showing his "bias" against Petitioner for being related to Shorts. (See Objections at 12-13.) Petitioner's argument is based on a selective quoting of the R&R. The Magistrate Judge found that counsel was not deficient only as to hearsay statements about Petitioner's general passivity, which were redundant to Denmon's testimony and would likely be inadmissible. (R&R at 34-35.) Indeed, counsel could not have "impeached" Denmon with any of his prior consistent hearsay statements. (See Lodgment 2, Sealed Rep.'s Tr. at 12 (trial court agreeing with defense counsel that Bell's and Bolden's "prior consistent" hearsay statements as to Denmon would be inadmissible).) On the other hand, the Magistrate Judge found that as to hearsay statements pertaining to Denmon's desire to frame Petitioner to retaliate against Shorts – assuming Bell and Bolden even made those statements – counsel's error was not prejudicial. (R&R at 35.) Thus, Petitioner's contention that

the Magistrate Judge overlooked the possible impeachment value of some of Denmon's hearsay statements contradicts the actual findings of the R&R.

Petitioner highlights several small factual differences between Denmon's alleged statements to Bell and Bolden and Denmon's testimony in the "Relevant Background" section (see Objections at 3-4), apparently in an effort to show that investigating Bell's and Bolden's statements would have led to information with which to impeach Denmon. For instance, Petitioner claims that Denmon essentially testified that Petitioner had a gun during the robbery, whereas he told Bell and Bolden that Petitioner did not. But Denmon repeatedly testified that other robbers were armed but he did not see Petitioner with a gun during the robbery. (See Lodgment 2, 2 Rep.'s Tr. at 253-54, 260-62, 3 Rep.'s Tr. at 459, 467-68, 472-73.) Denmon did not substantially change that assertion even after a codefendant's attorney attempted to impeach him with his apparently contradictory preliminary-hearing testimony:

[Counsel]: Do you remember whether [Petitioner] had a gun that evening . . . ?

[Denmon]: No. Not at the time that we were in the vehicle, no.

[Counsel]: When they left the vehicle to go into the house or when [Petitioner] came back out, in those times did [Petitioner] have a gun?

[Denmon]: Didn't see it.

. . . .

9

```
[Counsel]:     Do you remember saying [at the
               preliminary hearing] all three people had
               a gun?  All three people that went in had
               a gun?
[Denmon]:      Pretty sure you wouldn't go in someone's
               house without a gun, if that's what
               you're doin'.
[Counsel]:     Did you see [Petitioner] go into the
               house with a weapon?
[Denmon]:      No.
```
(Lodgment 2, 3 Rep.'s Tr. at 467-68.)  Denmon then stated again that he had not seen Petitioner with a gun but conceded that "I'm not saying he didn't have one, I just didn't see it." (Id. at 472-73.)  Thus, because Denmon generally testified that he did not see Petitioner with a gun, his purported hearsay statements corroborating that fact had no impeachment value.

    Finally, Petitioner misses the mark in claiming that the Magistrate Judge improperly conflated the standard of a sufficiency-of-the-evidence challenge with the prejudice prong of Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). (See Objections at 13.)  The Magistrate Judge did not automatically equate a rejection of Petitioner's sufficiency-of-the-evidence claim with a finding that counsel's alleged errors were not prejudicial.  The Magistrate Judge found that assuming counsel's failure to call those witnesses was deficient, it "was not prejudicial because, as explained in Section II, ample evidence independent of Denmon's testimony showed that Petitioner willingly participated in the crimes" (R&R

at 35).  A plain reading of that sentence shows that it referred to Section II for the evidence of guilt detailed therein, not the ultimate conclusion that a rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.  (See R&R at 23-26 (denying Petitioner's sufficiency-of-the-evidence claim in part because (1) victim Peggy Faulkner identified Petitioner as one of the robbers, (2) police officers subsequently found Petitioner and codefendant Shorts in Las Vegas driving Faulkner's Honda Accord, which contained items stolen during the robbery, (3) none of Petitioner's postarrest interview statements corroborated his duress defense, and (4) if Petitioner were a victim, he likely would have been shot in the head and left for dead, as all three other victims were).)

Thus, Petitioner's objections to the R&R regarding counsel's alleged ineffectiveness as to Bell, Bolden, and Ramos as well as Denmon's alleged video interview are without merit.

**II. The state court of appeal was not objectively unreasonable in denying Petitioner's Sixth Amendment subclaim asserting deprivation of counsel during a critical stage of the proceedings**

Petitioner challenges the Magistrate Judge's findings as to his Sixth Amendment claim as follows: (1) the subclaim allegedly should have been reviewed de novo (Objections at 15); (2) the Supreme Court's decision in Marshall v. Rodgers, 569 U.S. ___, 133 S. Ct. 1446, 1447, 185 L. Ed. 2d 540 (2013) (overruling Ninth Circuit's grant of habeas relief in Rodgers v. Marshall, 678 F.3d 1149 (9th Cir. 2012)), is factually distinguishable, mainly because Petitioner here "never waived counsel" and articulated

11

reasons for requesting substitute counsel (id. at 15-16); (3) the R&R incorrectly found that Petitioner's new-trial motion challenged only counsel's ineffectiveness (id. at 17); and (4) in any event, "because [Petitioner] was left entirely without a lawyer at a critical stage of the proceedings . . . his Sixth Amendment right to counsel was violated" (id. at 18-19).

The Magistrate Judge correctly reviewed this subclaim under AEDPA deference. As noted in the R&R and not contested by Petitioner, he raised the same subclaim on direct appeal, arguing that "the trial court violated the Sixth Amendment in denying his new-trial motion without holding a hearing or appointing substitute counsel because his counsel refused to argue his own ineffectiveness, thus depriving Petitioner of assistance of counsel at a critical stage of the proceedings." (See R&R at 3-4; Lodgment 3 at 25-35.) He asserts that he is entitled to de novo review merely because the court of appeal "never acknowledged" that subclaim. (Objections at 15.) Petitioner's contention is factually incorrect because the court of appeal expressly denied the subclaim pursuant to People v. Smith, 6 Cal. 4th 684, 696, 25 Cal. Rptr. 2d 122, 130 (1993) (discussing circumstances under which trial court must appoint substitute counsel to file postverdict motion challenging existing counsel's effectiveness). (See Lodgment 9 at 32-33.) In any event, even if the court of appeal had failed to expressly discuss the subclaim, the Supreme Court recently confirmed that a state court is presumed to have adjudicated all claims on the merits even when it expressly addresses only certain claims. See Johnson v. Williams, 568 U.S. ___, 133 S. Ct. 1088, 1091-92, 185 L. Ed. 2d

105 (2013) (extending presumption under <u>Harrington v. Richter</u>, 562 U.S. ___, 131 S. Ct. 770, 786-87, 178 L. Ed. 2d 624 (2011), that state court's summary denial is on merits to situation in which state court expressly addresses some but not all claims).

Even though the R&R predates the Supreme Court's decision in <u>Rodgers</u>, the Magistrate Judge's substantive analysis distinguishing the Ninth Circuit's since-overruled opinion and denying relief remains sound. In <u>Rodgers</u>, a defendant who had been granted the right to represent himself at trial sought to have counsel appointed to bring a new-trial motion, but the trial court denied his request. 133 S. Ct. at 1448. As observed by the Supreme Court, the Ninth Circuit parsed from circuit precedent two allegedly "clearly established" Sixth Amendment principles – namely, that a new-trial motion is a critical stage of the proceedings and that a defendant's waiver of his right to counsel at trial does not bar his subsequent reassertion of that right at a critical stage – and concluded that the state courts violated those principles by denying reappointment of counsel. <u>Id.</u> at 1448-49. The Supreme Court assumed without deciding that clearly established federal law recognizes that a postverdict motion for new trial is a critical stage. <u>Id.</u> at 1449. Nonetheless, the Supreme Court found that the Ninth Circuit had improperly "refine[d]" and "sharpen[ed]" a "general principle of Supreme Court jurisprudence" – the Sixth Amendment "safeguard[]" that a criminal defendant has the right to counsel "at all critical stages" – with circuit precedent prohibiting denial of reappointment of counsel in certain situations. <u>Id.</u> at 1449-50. Further, the Supreme Court noted a competing constitutional

13

principle, the right to self-representation, which creates "tension" with the Sixth Amendment right to counsel. Id. Thus, the Supreme Court held that although California, to deal with those competing concerns, had established a different framework from the Ninth Circuit's direct-appeal rule favoring reappointment of counsel – one allowing the trial judge to exercise discretion to reappoint counsel based on the totality of circumstances – "it cannot be said" under AEDPA that "California's approach is contrary to or an unreasonable application of the general standards established by the Court's assistance-of-counsel cases." Id. (internal quotation marks and alteration omitted).

Here, the R&R found no clearly established Supreme Court precedent addressing whether substitute counsel must be appointed whenever a defendant's new-trial motion challenges existing counsel's performance. (R&R at 49-50.) The R&R noted California's "long-established" procedure for such motions: the trial court should appoint substitute counsel "when, and only when," failure to do so "would substantially impair the right of assistance of counsel." (Id. at 50-51 (quoting Smith, 6 Cal. 4th at 696 (noting competing concerns of defendant's Sixth Amendment right to counsel and conflict-free representation when he challenges existing counsel's effectiveness)).) In particular, California allows the trial court to address the new-trial motion without substituting counsel if existing counsel's alleged ineffectiveness can be assessed based on the trial record; if not, the defendant still needs to present a "colorable claim" of ineffective assistance to warrant appointment of new counsel.

(R&R at 51.) Thus, absent Supreme Court precedent requiring appointment of substitute counsel whenever a defendant challenges existing counsel's effectiveness in a new-trial motion, the state courts' denial of substitute counsel based on California's procedure was not contrary to, or an objectively unreasonable application of, the general Sixth Amendment safeguard ensuring the right to counsel at all critical stages. Petitioner has conceded the propriety of California's procedure and does not object to it here (see Supp. Reply at 7 (Petitioner conceding that "[t]he problem is not California's standard" under Smith)), and as the R&R noted (R&R at 52-54), Petitioner's claims of ineffective assistance of counsel were capable of being resolved based on the trial record. Accordingly, under California law and the Court's clearly established constitutional law, the state courts did not err.

Petitioner's remaining assertions fail. He attempts to distinguish Rodgers, arguing that unlike the "factual posture" there, he never represented himself at trial or claimed that he could file the new-trial motion without counsel. (See Objections at 15-16.) Those factual differences – which Petitioner failed to highlight in his Supplemental Reply relying on the Ninth Circuit's then-favorable decision in Rodgers (see Supp. Reply at 4-6) – are not material, however. As noted above, in Rodgers the Supreme Court held that California's procedure permitting a trial court to weigh the totality of the circumstances in reappointing counsel at the postverdict stage, in light of the competing constitutional concerns of the right to counsel and to self-representation, did not violate general Sixth Amendment

15

precedent.  See 133 S. Ct. at 1449-50.  Here, California uses a different framework with different factors to address the constitutional dilemma when a defendant challenges existing counsel's ineffectiveness in a postverdict motion for new trial.  Compare id. (noting that California permits trial court to consider "totality of the circumstances" in addressing defendant's post-Faretta[4]-waiver requests for counsel, such as quality of self-representation, prior proclivity to request substitute counsel, reasons for request, length and stage of proceedings, and potential disruption or delay upon granting request (quoting People v. Lawley, 27 Cal. 4th 102, 149, 115 Cal. Rptr. 2d 614, 653 (2002))), with Smith, 6 Cal. 4th at 696 (permitting trial court to substitute counsel when defendant shows either counsel's deficient representation or parties' irreconcilable conflict and when failure to do so would substantially impair right to counsel).  Nonetheless, the Supreme Court rested its ruling on the legal principle that without clearly established federal law, certain state-created frameworks addressing competing constitutional concerns for and against appointment of counsel do not violate general Sixth Amendment law prohibiting the denial of counsel at all critical stages.  Rodgers, 133 S. Ct. at 1449-50.  Thus, Petitioner has failed to meaningfully distinguish Rodgers, which involved a different California procedure, particularly because he does not even challenge the relevant state framework here.

    Petitioner's challenge to the R&R's finding that ineffective

---

[4] Faretta v. California, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

assistance of counsel was the sole basis of his new-trial motion is equally unpersuasive. (See Objections at 17.) Petitioner mostly repeats his argument from the Supplemental Reply (see Supp. Reply at 5-6) that trial counsel's suggestion that substitute counsel be appointed "for the limited purpose of exploring a motion for new trial" indicates that other bases for the motion existed. But just because counsel "did not say another lawyer should be appointed to explore one claim – [his] ineffectiveness" (see Objections at 17 (emphasis in original)) does not mean that counsel sought to raise any other bases for a new trial. In addition to the reasons outlined in the R&R as to why ineffective assistance of counsel was the only claim Petitioner sought to raise (see R&R at 51-52), counsel stated that he believed Petitioner "ha[d] a right to make a motion for new trial based on ineffective assistance of counsel" and confirmed with the court that he was "in agreement that [Petitioner] is bringing a motion for new trial at this point, based upon the information the Court received during the Marsden hearing" (see, e.g., Lodgment 2, Normal Rep.'s Tr. at 4, 8 (emphasis added)). Again, as the R&R noted, "counsel did not have a conflict of interest in arguing any other grounds for a new trial and presumably would have done so had he deemed any meritorious." (R&R at 52.)

    Finally, Petitioner's "bottom line" contention – that he was left completely without counsel at a critical stage of the proceedings, in violation of the Sixth Amendment – is overbroad and at a minimum confuses the standards of review on direct appeal and under AEDPA. (See Objections at 18-19.) It is beyond

dispute that under AEDPA, "[t]he starting point . . . is to identify the clearly established Federal law, as determined by the Supreme Court of the United States[,] that governs the petitioner's claims." See Rodgers, 133 S. Ct. at 1449 (internal quotation marks and citation omitted). As the above cases and those cited in the R&R make clear, deprivation of counsel at a critical stage does not by itself constitute a Sixth Amendment violation warranting habeas relief. (See R&R at 49, 54-55 (noting that even under Ninth Circuit's since-overruled decision in Rodgers, fact that new-trial motion was "critical stage" "does not end the inquiry," which involved two additional steps: (1) whether denial of counsel at critical stage was clearly established federal law and (2) whether state-court denial was contrary to or unreasonable application of that clearly established law (quoting 678 F.3d at 1156, 1163, rev'd on other grounds, 133 S. Ct. at 1447))); cf. Rodgers, 133 S. Ct. at 1449-50 (even assuming posttrial motion for new trial and any hearing thereon clearly established as "critical stage," state court's finding that trial court did not abuse discretion in denying petitioner's request for reappointment of counsel was not contrary to general Sixth Amendment precedent).

Indeed, the Ninth Circuit has long recognized that a new-trial motion constitutes a critical stage of the proceedings, see Menefield v. Borg, 881 F.2d 696, 699 (9th Cir. 1989), but it nonetheless has denied habeas relief when a petitioner unsuccessfully sought appointment of substitute counsel to argue existing counsel's ineffectiveness and had to do so both pro se, "in a series of letters to the trial judge," and through existing

counsel at a hearing, <u>Jackson v. Ylst</u>, 921 F.2d 882, 887-88 (9th Cir. 1990) (denying claim as barred by <u>Teague v. Lane</u>, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989), because "under the law of this circuit, there is no automatic right to a substitution of counsel simply because the defendant informs the trial court that he is dissatisfied with appointed counsel's performance").

Petitioner's broad contention intimating an absolute, irrevocable right to counsel at the postverdict, preappeal stage does not even comport with the law on direct appeal, given that the Ninth Circuit has declined to address whether substitute counsel must be appointed when a trial court does not hold an evidentiary hearing to address a new-trial motion alleging existing counsel's ineffectiveness. See <u>United States v. Del Muro</u>, 87 F.3d 1078, 1080-81 & n.4 (9th Cir. 1996) (requiring appointment of substitute counsel when trial court holds evidentiary hearing to address defendant's new-trial motion challenging effectiveness of existing counsel but declining to decide whether same right applies when court decides motion based on existing record). Thus, contrary to Petitioner's assertion, a federal district court could deny such a motion based on the existing record without committing any error, let alone running afoul of the Sixth Amendment.

Accordingly, the Magistrate Judge properly found that the court of appeal's denial of Petitioner's Sixth Amendment subclaim was not objectively unreasonable.

**III. Conclusion**

Having reviewed de novo those portions of the R&R to which

1  objections were filed, the Court accepts the findings and
2  recommendations of the Magistrate Judge.
3       IT THEREFORE IS ORDERED that (1) the Petition is denied
4  without leave to amend and (2) Judgment be entered dismissing
5  this action with prejudice.

7  DATED: December 3, 2015          /s/ Margaret M. Morrow
                                    MARGARET M. MORROW
                                    U.S. DISTRICT JUDGE